IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| MEGAN DAHMS, | ) | CASE NO. 3:25-cv-02549-JJH |
| | ) | |
| Plaintiff, | ) | JUDGE JEFFREY J. HELMICK |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | REUBEN J. SHEPERD |
| FRANK BISIGNANO, | ) | |
| Commissioner of Social Security | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

## I. Introduction

Plaintiff Megan Dahms ("Dahms") seeks judicial review of the final decision of the Commissioner of Social Security, denying her application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act. This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b). Because the Administrative Law Judge ("ALJ") applied proper legal standards, I recommend that the Commissioner's final decision denying Dahms' SSI be affirmed.

## II. Procedural History

Dahms protectively filed for SSI on March 17, 2023, alleging disability beginning October 16, 2022. (Tr. 191). These claims were denied initially on November 30, 2023, and upon reconsideration on March 1, 2024. (Tr. 62, 75). Dahms then requested a hearing before an ALJ. (Tr. 100). Dahms, represented by counsel, and a Vocational Expert ("VE") testified before an ALJ on September 17, 2024. (Tr. 41-61). On November 13, 2024, the ALJ issued a written decision finding Dahms not disabled. (Tr. 14-35). The Appeals Council denied her request for

review on January 6, 2025, making the hearing decision the final decision of the Commissioner. (Tr. 1-6; see 20 C.F.R. §§ 404.955, 404.981).

Dahms timely filed this action on November 21, 2025. (ECF Doc. 1). She raises two issues for this Court's review:

1. Whether the ALJ reversibly erred in his evaluation of Dahms' need for an ambulatory assistive device, and

2. Whether the ALJ reversibly erred by failing to recontact consultative examining psychologist Dr. Dubey, who the ALJ found submitted an incomplete medical source opinion.

(ECF Doc. 8, p. 1).

## III. Evidence

### A. Personal, Educational, and Vocational Evidence

Dahms was born January 8, 1994. (Tr. 33). She was 29 years old on the date the application was filed, making her a younger individual age 18-44 according to agency regulations. (*Id.*). She has at least a high school education. (*Id.*). She has no past relevant work. (*Id.*).

### B. Relevant Medical Evidence

On January 13, 2022 Dahms underwent a brain MR scan without contrast to investigate a lucent-appearing lesion involving the left aspect of the clivus at the skull base with some soft tissue component. (Tr. 1430). The MR scan revealed a mass replacing the clivus and occipital condyle with extension into the basilar cistern measuring 27 x 29 x 42 mm in craniocaudal, AP and transverse dimension. (Tr. 1431). Dahms presented to The James Comprehensive Skull Base and Pituitary Center for consultation on January 21, 2022, where she reported a history of chronic neck pain worsened by lateral head rotation, migraines, epilepsy managed with marijuana use, diabetes mellitus and intermittent weakness in her bilateral lower extremities. (Tr.

919). Neurosurgeon Thomas Hardesty, M.D., recommended surgical resection of the C2 mass followed by occipitocervical fusion. (Tr. 922).

A CT angio of the brain and neck performed on January 22, 2022 showed a lytic posterior skull based lesion involving the occipital portion of the clivus with extraosseous extension into the prevertebral and epidural space at the level of the foramen magnum, with the epidural component abutting and dorsally displacing the left vertebral artery without complete encasement or narrowing of the lumen, and involvement of the medial margin of the left jugular foramen without occlusion of the jugular bulb. (Tr. 1188). On January 31, 2022, Dahms underwent an excision of intracranial brain tumor and lesion cranial fossa posterior (Tr. 830), followed by an occiput to C3 posterior segmental instrumentation with screws and rods and arthrodesis. (Tr. 828). Dahms was discharged from the hospital on February 8, 2022 with a new walker. (Tr. 905).

A brain MRI on February 14, 2022 showed maturing post-operative changes following surgical resection of clival chordoma with skull base reconstruction and posterior craniocervical fixation with no evidence of residual or recurrent tumor or fluid collection. (Tr. 1011). At a February 24, 2022 follow-up visit, Dahms denied focal weakness, dizziness, gait imbalance or speech difficulty. (Tr. 775). A head CT without contrast performed on March 17, 2022 also showed post-operative changes from anterior-approach clival mass resection and occipitocervical fixation, with the hardware appearing grossly intact. (Tr. 985). The clival defect was not significantly changed from prior exam, and there were no new or increasing erosive changes. (*Id.*). At a three-month follow-up examination on April 6, 2022, Dahms reported she was doing fair but reported continued axial neck pain and tightness along her paraspinal muscles. (Tr. 742).

She denied weakness or difficulty with balance or gait and stated that she had not yet started physical or occupational therapy. (*Id.*).

Dahms attended a radiation oncology consultation on April 14, 2022 via telephone. (Tr. 414). As she was preparing to begin radiation therapy, she reported to her primary care provider, Brooke Taylor Lowe, CNP, that she was experiencing nausea and vomiting, and that she was extremely fatigued. (Tr. 538). She added that she was depressed, and that she was constantly crying and had no motivation to do anything. (*Id.*). She thought she was seeing some benefit from her Zoloft prescription but thought a change in medication could be useful. (*Id.*).

Dahms presented to the Grady Memorial Hospital Emergency Department on May 6, 2022, complaining of persistent nausea and vomiting with headache. (Tr. 422). She noted that she had lost 45 pounds since her brain surgery, and that she was taking Oxycontin for chronic pain. (*Id.*). An abdominal CT was normal but for a small periumbilical hernia. (Tr. 427). After discharge, she returned to the Emergency Department that same day following a motor vehicle accident, and cervical and head CT's showed no evidence of complication in her posterior fusion. (Tr. 447). At an office visit with CNP Lowe on May 11, 2022, Dahms reported that Zoloft was managing her depressive symptoms, but she was having increasing anxiety attacks. (Tr. 558). CNP Lowe prescribed Buspar for anxiety and Tazidime for sleep. (*Id.*).

Dahms began receiving proton therapy for her clival chordoma, and at her third fraction on May 18, 2022, she reported shooting pains in her neck. (Tr. 373). At her session on May 22, 2022, Dahms also reported persistent nausea that she was trying to manage with Compazine and medical marijuana. (Tr. 376). After completing 32 of the planned 39 fractions of proton therapy, Dahms decided to discontinue the treatment on July 11, 2022, due to discomfort, stress and issues with transportation. (Tr. 382). On July 26, 2022, Dahms' neurosurgeon provided a return-

to-work letter starting August 8, 2022, although he recommended seeking a similar letter from her radiation oncologist. (Tr. 726).

At an office visit on September 22, 2022, Dahms complained of episodes of dizziness with positional changes, with associated palpitations, racing heart and shortness of breath. (Tr. 601). She states the symptoms will abate if she sits for a few minutes, and she has found albuterol useful. (*Id.*). She also reported bilateral lower extremity swelling. (*Id.*). At a follow-up visit on October 3, 2022, Dahms reported generalized fatigue, intermittent chest pain, dizziness and lightheadedness. (Tr. 625).

Dahms attended a post-operative follow-up visit with David Xu, M.D., on October 24, 2022. (Tr. 721). She reported ongoing postoperative pain and myofascial dysfunction since the surgery. (*Id.*). She appeared well, with no apparent distress, loss of muscle tone or atrophy noted. (Tr. 723). Her upper and lower extremities showed 5/5 strength. (*Id.*). A cervical x-ray was performed and showed stable cervical hardware with loss of cervical lordosis seen on neutral view, though her cervical spinal alignment corrected to normal on extension. (*Id.*). A brain MRI performed on November 18, 2022 showed no evidence of residual or recurrent tumor. (Tr. 704).

Dahms presented to the Grady Memorial Hospital Emergency Department on January 3, 2023 for evaluation of low blood pressure and near syncopal episodes. (Tr. 459). She reported not eating or drinking as much as she should, and that she becomes dizzy when she changes position. (*Id.*). She also reported ongoing neck and back pain. (*Id.*). An echocardiogram was found to be normal, and her orthostatic vital signs were stable. (Tr. 468).

On January 9, 2023, Dahms appeared at the Morrow County Hospital Emergency Department complaining of chest pain worse with breathing, dizziness, fatigue, intermittent rapid heart rate and episodes of passing out. (Tr. 1460). She indicated that she had undergone tilt table

testing, an echocardiogram and Holter monitoring, all of which were normal, but she still felt as though something were wrong with her. (*Id.*). She had been told that her symptoms were related to anxiety. (Tr. 1461). She was assessed with pleurisy and a urinary tract infection. (Tr. 1465).

Dahms underwent an evaluation for physical therapy on January 13, 2023, where she indicated that she suffered from neck, back and shoulder pain, and had difficulty walking. (Tr. 712). She reported an inability to lift anything heavier than a gallon of milk and reported that she was using a walker. (*Id.*). She rated her pain at 8-9/10, with radiating neck pain that could go up to 10/10. (*Id.*). She was assessed with impaired balance and abnormal posture, with deconditioning, muscle weakness, impaired range of motion, impaired neuromuscular control, joint hypermobility, pain with movement and limited aerobic capacity. (Tr. 716). At a PT examination on January 24, 2022, she reported losing feeling in her leg and sudden weakness and stated she had fallen 25 times in one day at her house, leading to a four-day hospitalization. (Tr. 487, 673). By January 26, 2023, she had regained feeling in her legs though she still felt weak and had some pain in the left leg. (Tr. 673) She said that she walked on her tiptoes because her legs will buckle if she puts pressure on them. (*Id.*). She was given a six-month handicap placard and directed to continue with physical therapy. (Tr. 677).

Dahms also treated with pain management, with a February 27, 2023 examination documenting ongoing use of narcotic pain medication to treat neck, back, shoulder, arm, wrist, hand, leg, ankle, foot and back pain. (Tr. 1955-60). She indicated her activity level was 8/10. (Tr. 1961). A subsequent pain management examination note indicated her pain level was 7/10 without pain medication, but it dropped to 1/10 with the use of opioids. (Tr. 1971). Examination notes described normal gait, bilateral facet tenderness, and painful lumbar flexion and extension. (Tr. 1973).

Dahms visited the Ohio State University Wexner Medical Center Division on Gastroenterology, Hepatology and Nutrition on March 28, 2023, and indicated that she experiences nausea all day, has 3-4 emesis daily, with weight fluctuating from 250 pounds to her current weight between 180-190 pounds. (Tr. 705-06). She reported lightheadedness, dizziness and fatigue as well, and noted numbness and tingling in her hands and legs and falls attributable to a nerve in her leg that had led to her use of a walker. (Tr. 706). She was referred for celiac testing and endoscopy/colonoscopy, and directed to return for follow-up in six months. (*Id.*). An endoscopy/colonoscopy was performed on July 26, 2023, and returned benign findings. (Tr. 1596). At an August 3, 2023 pain management appointment she displayed a normal gait with no neurological deficits and described her physical activity as light. (Tr. 1965-66). At a primary care visit on August 17, 2023, her gait and stance were described as "normal." (Tr. 2336).

At a follow-up visit with Samuel Akinyeye, M.D., of the Division of Gastroenterology, Hepatology and Nutrition, on September 7, 2023, Dahms reported ongoing issues with nutritional intake, and it was determined that she would be admitted to assess her ability to tolerate tube feedings and consider PEG placement. (Tr. 1578). Patient resources prior to admission noted that Dahms used a walker and a rollator. (Tr. 1552). On September 13, 2023, she underwent an Upper GI Endoscopy and PEG placement due to her inability to eat. (Tr. 1614). At a follow-up visit on October 30, 2023, she indicated that since the tube placement she was 100 percent improved, with more activity and energy. (Tr. 1522). She had been eating more by mouth and had lost weight during two weeks when she was not tolerating tube feeding due to tube formulation but overall was doing well. (*Id.*).

At a January 20, 2024 pain management visit Dahms requested an increase of her opioid dosage as the current dosage was no longer effective. (Tr. 1984). On examination, she had

positive Faber test and Patric's sign bilaterally. (Tr. 1987). Dahms was hospitalized due to an abdominal abscess in February 2024, and was described on February 7, 2024 as "ambulat[ing] in a hallway without walker. Walked without any distress or unsteady gait." (Tr. 1926). At a March 26, 2024, telehealth visit Dahms indicated her primary concern was depression which she attributed to her physical health and recent falling out with her best friend. (Tr. 2297). She was prescribed Wellbutrin and medication for attention deficit disorder and referred for counseling. (*Id.*).

On July 11, 2024, Dahms presented to the emergency department complaining of dizziness and palpitations. (Tr. 2051). She stated that she had increased exhaustion and shortness of breath, and as a result she had been using her cane to walk. (Tr. 2052). She was assessed with lightheadedness and palpitation and provided a return-to-work letter for July 12, 2024. (Tr. 2089).

**C. Medical Opinion Evidence**

**1. State Agency Reviewing Opinion Evidence**

On November 27, 2023, state agency reviewing physician Elizabeth Das, M.D., opined that Dahms was able to frequently and occasionally lift and/or carry ten pounds, sit for six hours of an eight-hour workday, and stand and/or walk for four hours of an eight-hour workday. (Tr. 69-70). Dr. Das further opined that Dahms could occasionally climb ramps or stairs but never climb ladders, ropes or scaffolds; occasionally stoop, kneel, crouch or crawl; and she was precluded from working at unprotected heights or hazardous machinery with moving mechanical parts. (Tr. 70-71). Dr. Das also found that Dahms was precluded from commercial driving. (Tr. 71). State agency reviewing physician Leon Hughes, M.D. affirmed Dr. Das' opinion on February 27, 2024. (Tr. 81-83).

On November 29, 2023, state agency reviewing psychologist Amy Johnson, Psy.D., opined that Dahms had moderate limitations in the domains of understanding, remembering or applying information; interacting with others; concentrating, persisting or maintaining pace; and adapting or managing oneself. (Tr. 68). Dr. Johnson further opined that that Dahms had moderate limitations in her ability to understand, remember and carry out detailed instructions; to complete a normal workday or workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number or length of rest periods; to interact appropriately with the general public; to respond appropriately to changes in the work setting; or to set realistic goals or make plans independently of others. (Tr. 71-72). State agency reviewing psychologist Jennifer Kutys, Psy.D., affirmed Dr. Johnson's opinion on February 27, 2024. (Tr. 79-80, 83-84).

**2. Consultative examiner opinions**

On November 13, 2023, Dahms presented for a consultative mental health examination with Subhir Dubey, Psy.D. (Tr. 1720-36). She reported a history of depression, anxiety and PTSD dating back to her childhood, and memory issues arising from epilepsy since she was age 15. (Tr. 1720). She reported a history of sexual abuse and notes she is currently involved in a stable relationship for 12 years. (Tr. 1720-21). She describes her mood as good and reports it has improved over the past three years due to her medication regimen. (Tr. 1721). She does report some anxiety related to "hospitalization" or "being away from home." (*Id.*). She is a high school graduate and had an IEP throughout her education. (Tr. 1722). She currently works at a gas station 24 hours per week. (*Id.*). She reports that she is able to perform her activities of daily living. (*Id.*). Her full-scale IQ score was measured at 71, which falls in the borderline range.

(Tr.1723). Dr. Dubey diagnosed Dahms with depressive disorder, not otherwise specified, partial remission; and an unspecified neurocognitive disorder. (Tr. 1725).

Dr. Dubey opined that Dahms would be able to understand, remember, and carry out simple instructions independently, and could perform multi-step instructions on her own. (Tr. 1726). Dr. Dubey further opined that Dahms would be able to maintain concentration, attention and pace to remember and carry out simple tasks on her own but would need be able to do so with multi-step tasks, and would require supervision, time and simpler tasks. (*Id.*). Dr. Dubey did not feel that Dahms would have any significant issues in dealing with work supervision or coworkers. (Tr. 1727). She would, however, have many issues dealing with work pressure due to cognitive, attention and memory issues. (*Id.*). He opined that under stress Dahms' mood issues would be exacerbated leading to moderate problems for her, her coworkers and her supervisors. (*Id.*).

**D. Administrative Hearing Evidence**

Dahms testified before an ALJ on September 17, 2024. (Tr. 46-56). Dahms testified that she had just moved into a house with her boyfriend, daughter and father-in-law. (Tr. 47). She has a driver's license, but due to night blindness and astigmatism she must wear glasses to drive at night. (*Id.*). She currently works eight to ten hours weekly doing merchandising in stores. (*Id.*).

Dahms further testified that she is prevented from working full-time by her feeding tube that she wears and is connected to at all times, and by her POTS diagnosis that causes her to feel lightheaded and dizzy and sometimes leads to her passing out. (Tr. 48). While she has had a few jobs over the past couple of years, they have not lasted very long because she is constantly sick and in and out of the hospital. (Tr. 48-49). Dahms also reported that she sleeps poorly, despite medication, primarily due to her severe depression and the hardware in her neck that causes

constant pain. (Tr. 49). Dahms testified that she rarely goes to a grocery store, and when she does, she will ride in an automatic cart. (*Id.*). This is because if she stands or walks far distances, she will become lightheaded and dizzy and may fall or pass out. (*Id.*).

Dahms stated that she attends counseling monthly, and that she is generally able to understand and follow television programs. (Tr. 49-50). She uses her cane or walker to go up or down the stairs to maintain stability. (Tr. 50). She requires assistance for bathing. (*Id.*). She can lift no more than ten pounds, can walk no more than ten feet before becoming lightheaded and dizzy, and can stand for four hours with frequent breaks. (*Id.*). After an hour of sitting, Dahms need to "get up and move" before her legs and body get stiff. (*Id.*). In a typical day she will clean her kitchen and cook, but she spends most of her day sitting down. (Tr. 50-51). She does not often do dishes, clean around the house or do laundry. (Tr. 51). Her hobbies include diamond painting and gaming. (*Id.*).

Dahms uses a cane or walker because of her instability, though she mostly relies on the cane. (Tr. 51-52). The cane was prescribed by her doctor following her neck surgery, and she uses it daily. (Tr. 52). Even with the cane she falls four or five times monthly, including on the day before the hearing. (*Id.*). She currently is in physical therapy and takes pain medication to treat her neck. (*Id.*). Dahms reports having three headaches or migraines weekly that are triggered by light or sound. (Tr. 53).

Under questioning by her attorney, Dahms testified that she uses her walker once or twice monthly when she is feeling sick or weak. (*Id.*). While doing her job, Dahms frequently takes breaks lasting 30-60 minutes. (*Id.*). Her typical work shift lasts from 30 minutes to three hours. (Tr. 54). When Dahms gets a migraine, she will take Ibuprofen and lay down in a dark room with a cold washcloth on her head. (Tr. 55). She has had problems with her feeding tube, and it is

currently infected which causes her to have pain and vomiting. (Tr. 56). Dahms added that she has numbness and tingling in her arms and hands due to the hardware in her neck pinching nerves, which will cause her to drop things. (*Id.*). She also has similar numbness and tingling in her legs. (*Id.*).

Once Dahms completed her testimony, VE Kari Seaver testified. (Tr. 57-60). For his first hypothetical, the ALJ asked the VE to consider a hypothetical individual of Dahms' age and education, and to assume the individual is limited to work at the sedentary exertional range, except that the individual could stand or walk up to four hours during the workday; could occasionally climb ramps or stairs, but could not climb ladders, ropes or scaffolds; could occasionally stoop, kneel, crouch or crawl; could have no exposure to workplace hazards such as unprotected heights or dangerous, unprotected moving mechanical parts; and could do no commercial driving. (Tr. 57). The VE opined that the hypothetical individual could perform unskilled sedentary jobs including sorter, DOT #669.687-014, with 12,000 jobs in the national economy; assembler, DOT #713.687-018, with 25,000 jobs in the national economy; and packer, DOT #559.687-014, with 22,000 jobs in the national economy. (*Id.*).

For a second hypothetical, the ALJ asked the VE to consider the same circumstances of the first hypothetical but with the additional limitation that the individual would be off-task for five percent of the workday. (Tr. 58). The VE opined that this individual could perform all of the same jobs from the first hypothetical. (*Id.*). For his third hypothetical, the ALJ added the limitation that the individual could perform simple, routine, repetitive tasks with no more than occasional minor changes in duties and the work setting. (*Id.*). The VE opined that this individual could still perform the jobs cited in the two prior hypotheticals. (*Id.*). With the additional limitation to superficial interaction with co-workers and public, meaning that interactions would

be limited to the straightforward exchange of information without negotiation, persuasion, engaging in conflict or complaint resolution or customer service duties, the individual could still perform the same jobs. (*Id.*). With the addition of the requirement of a cane for ambulation, the same jobs would remain. (Tr. 58-59).

If, however, the individual was off-task 20 percent, there would be no work. (Tr. 59). There would also be no work if the individual required three additional 15-minute breaks per workday. (*Id.*). While the individual could still perform the jobs cited in the earlier hypotheticals if they required a cane for standing and ambulation, they would be unable to do so if they required a walker for standing and ambulation. (*Id.*). Frequent falls in the workplace typically would not be tolerated by the employer. (Tr. 60).

## IV. The ALJ's Decision

In her decision dated June 26, 2024, the ALJ made the following findings:

1. The claimant has not engaged in substantial gainful activity since March 17, 2023, the application date (20 CFR 416.971 *et seq.*).

2. The claimant has the following medical impairments: chordoma clivus, status-post gross total resection and posterior occipital to cervical fusion; postural orthostatic tachycardia syndrome (POTS); chronic pain syndrome; irritable bowel syndrome, gastritis, functional gastrointestinal disorder/motility disorder status-post percutaneous endoscopic gastrotomy (PEG); depressive disorder; neurocognitive disorder; attention deficit hyperactivity disorder (ADHD); and posttraumatic stress disorder (PTSD) (20 CFR 416.920(c)).

3. The claimant does not have an impairment or combination of impairments that me*et*s or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 416.967(a) except that the claimant can have up to four hours of standing and/or walking during the workday. She could occasionally climb ramps and stairs. No climbing ladders, ropes or

scaffolds. Occasionally stoop, kneel, crouch, crawl. No exposure to workplace hazards such as unprotected heights or dangerous, unprotected moving mechanical parts. No occupational driving. Due to a combination of conditions and associated symptomology, including pain, the claimant would be off task 5% of the time during the workday. The claimant is limited to perform simple, routine, repetitive tasks with no more than occasional, minor changes in duties in the work setting. She is limited to superficial interaction with coworkers and the public meaning interactions would be limited to the straightforward exchange of information, without negotiation, persuasion, engaging in conflict or complaint resolution, or customer service duties.

5. The claimant has no past relevant work (20 CFR 416.965).

6. The claimant was born on January 8, 1994, and was 29 years old, which is defined as a younger individual age 18-44, on the date the application was filed (20 CFR 416.963).

7. The claimant has at least a high school education (20 CFR 419.964).

8. Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9. Considering the claimant's age, education, work experience, and residual functional capacity, that are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969, and 416.969a).

10. The claimant has not been under a disability, as defined in the Social Security Act, since March 17, 2023, the date the application was filed (20 CFR 416.920(g)).

(Tr. 14-29).

## V. Law and Analysis

### A. Standard for Disability

Social Security regulations outline a five-step process the ALJ must use to determine whether a claimant is entitled to benefits:

1. whether the claimant is engaged in substantial gainful activity;

2. if not, whether the claimant has a severe impairment or combination of impairments;

3. if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1;

4. if not, whether the claimant can perform their past relevant work in light of his RFC; and

5. if not, whether, based on the claimant's age, education, and work experience, they can perform other work found in the national economy.

20 C.F.R. § 404.1520(a)(4)(i)-(v)[1]; *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006). The Commissioner is obligated to produce evidence at Step Five, but the claimant bears the ultimate burden to produce sufficient evidence to prove they are disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a).

**B. Standard of Review**

This Court reviews the Commissioner's final decision to determine whether it is supported by substantial evidence and whether proper legal standards were applied. 42 U.S.C. § 405(g); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). However, the substantial evidence standard is not a high threshold for sufficiency. *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). "It means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.*, quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). Even if a preponderance of the evidence supports the claimant's position, the Commissioner's decision cannot be overturned "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

[1] The regulations governing DIB claims are found in 20 C.F.R. § 404 *et seq.* and the regulations governing SSI claims are found in 20 C.F.R. § 416, *et seq.* Generally, these regulations are duplicates and establish the same analytical framework. For ease of analysis, I will cite only to the relevant regulations in 20 C.F.R. § 404 *et seq.* unless there is a relevant difference in the regulations.

Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence. *Id.* at 476. And "it is not necessary that this court agree with the Commissioner's finding," so long as it meets the substantial evidence standard. *Rogers*, 486 F.3d at 241; *see also Biestek*, 880 F.3d at 783. This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and that error prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we review decisions of administrative agencies for harmless error."). Furthermore, this Court will not uphold a decision when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011). Requiring an accurate and logical bridge ensures that a claimant and the reviewing court will understand the ALJ's reasoning, because "[i]f relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked." *Shrader v. Astrue*, No. 11-13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012).

**VI. Discussion**

In her Brief on the Merits, Dahms raised two issues for this Court's review.

1. Whether the ALJ reversibly erred in his evaluation of Dahms' need for an ambulatory device, and

2. Whether the ALJ reversibly erred by failing to recontact consultative examining psychologist Dr. Dubey, who the ALJ found submitted an incomplete medical source opinion.

(ECF Doc. 8, p. 1).

**A. The ALJ did not err in his determination to not require the use of an ambulatory assistive device in the RFC.**

Dahms argues that the ALJ erroneously found that "[t]here is no documented medical need for use of an assistive device." (ECF Doc. 8, p. 6 (citing Tr. 56)). Dahms contends that the record contains many references to her use of an assistive device, and that the ALJ reversibly erred in failing to consider whether her use of a hand-held assistive device was medically required. (*Id.* at pp. 6-7). Finally, Dahms challenges the ALJ's reliance on instances from the record when Dahms did not utilize an assistive device to ambulate in the determination of the RFC. (*Id.*, at pp. 7-8).

The Commissioner retorts that the ALJ properly analyzed the objective evidence when determining that an assistive device was not medically necessary. (ECF Doc. 9, p. 12). The Commissioner adds that while the state agency reviewing physicians did note Dahms' use of a cane when discussing the medical evidence, those consultants did not include a need for an assistive device in their RFC assessments. (*Id.* at p. 13). In the Commissioner's view, while Dahms pointed to evidence of her using an assistive device, none of the evidence she highlighted satisfied the documentation required by Social Security Ruling ("SSR") 96-9p to show that an assistive device was medically required. (*Id.*).

The Sixth Circuit has explained that a hand-held assistive device "cannot be considered an exertional limitation" for purposes of an RFC if it "was not a necessary device for claimant's use." *Carreon v. Massanari*, 51 F. App'x 571, 575 (6th Cir. 2002); *see also Drew v. Comm'r of Soc. Sec. Admin.*, No. 1:23-CV-01353-DAC, 2024 WL 2294784, at *9 (N.D. Ohio May 21,

2024) ("The ALJ is not required to incorporate the use of a cane in the RFC unless the cane is medically required.") (citing *Carreon*, 51 F. App'x at 575)).

Under Social Security Ruling 96-9p, an ALJ may only "find that a hand-held assistive device is medically required" if the record contains "medical documentation" that: (1) "establish[es] the need for a hand-held assistive device to aid in walking or standing"; and (2) "describ[es] the circumstances for which [the device] is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information)." SSR 96-9p, 61 Fed. Reg. 34478, 34482 (July 2, 1996).

As to the first requirement, SSR 96-9p calls for medical documentation of "the need for a hand-held assistive device to aid in walking or standing," not simply provider notations that a claimant was observed using an assistive device. *Id.*; *see also Barnes v. Comm'r of Soc. Sec.*, No. 5:21-CV-01688-JDA, 2023 WL 2988346, at *8 (N.D. Ohio Mar. 22, 2023) (collecting cases) ("[T]he fact that various physicians noted Mr. Barnes' use of a cane or a walker does not establish that an assistive device was medically necessary for purposes of SSR 96-9p."); *Phillips v. Comm'r of Soc. Sec.*, No. 5:20-CV-01718-CEH, 2021 WL 5603393, at *10 (N.D. Ohio Nov. 30, 2021) ("Although various medical records note that Claimant presented at appointments using a cane, these notations do not meet the requirements of SSR 96–9p.").

As to the second requirement, SSR 96-9p calls for medical documentation "describing the circumstances for which [the device] is needed," not simply a prescription for a device. *Id.*; *see also Barnes*, 2023 WL 2988346, at *8 (collecting cases). This is consistent with interpretation from courts within this circuit, and other circuit courts, that require an "unambiguous opinion from a physician stating the circumstances in which an assistive device is medically necessary." *Tripp v. Astrue*, 489 F. App'x 951, 955 (7th Cir. 2012); *see also Spaulding*

*v. Astrue*, 379 F. App'x 776, 780 (10th Cir. 2010) ("[T]he legal issue does not turn on whether a cane was 'prescribed' for Spaulding, but whether a cane was 'medically required.'); *Howze v. Barnhart*, 53 F. App'x 218, 222 (3d Cir. 2002) (finding prescription and references to use of cane without discussion of medical necessity to be insufficient to show medical necessity); *Drew*, 2024 WL 2294784, at *10.

Here, the ALJ assessed Dahms' claim that she needed an ambulatory assistive device by considering the requirements of SSR 96-9p in the context of the entire evidentiary record but found that "the evidence does not support use of an assistive device – either a cane or a walker." (Tr. 30). Specifically, the ALJ wrote:

> There is no documented medical need for use of an assistive device. While the claimant allegedly used a walker or cane due to dizziness or fatigue (see e.g., Exhibits 7F/166, 177; 8F/9, 11, 18, 213; 12F/38; 19F/18), the objective medical evidence does not show that an assistive device is medically necessary given mostly intact physical and neurological exams with normal, steady gait and no imbalance (see e.g., Exhibit 8F/41, 48, 74, 78, 81, 228; 12F/62; 14F/4, 12; 16F/11, 19, 26, 33; 18F/3, 13; 20F/55). In February 2024, the claimant ambulated in the hospital unassisted and without any distress or unsteady gait (Exhibit 15F/174). She more recently stated she used a cane due to exhaustion, but appeared comfortable, in no distress with no focal neurological deficits and baseline mental status (Exhibit 19F/18, 22). The state-agency medical consultants likewise did not find an assistive device medically necessary (Exhibits 2A, 4A). Thus, the evidence does not support use of an assistive device for ambulation, standing, or balance.

(*Id.*). This explanation clearly provides substantial evidence in support of the determination to omit a requirement for an assistive device from the RFC.

In support of her contention that an assistive device was "medically required," Dahms attempts to address SSR 96-9p's first requirement by noting that Dahms was "provided a 'new walker'" in February 2022; that she was using a 2-wheeled walker as needed at that time; that a treatment note from January 13, 2023 indicated that she uses a walker; and findings from March

2023 that were positive for "walker dependence."[2] (ECF Doc. 8, pp. 6-7). These references to her use of an ambulatory assistive device do not establish that the device was medically necessary for purposes of SSR 96-9p. *See Barnes*, 2023 WL 2988346, at *8. Even reading these references broadly, there is no affirmation from a medical source indicating that an assistive device was medically required. Further, even *assuming arguendo* that the first requirement under SSR 96-9p was met, there is no indication of the circumstances under which an assistive device was needed, as is necessary to meet the second requirement of SSR 96-9p.

Accordingly, the ALJ correctly applied SSR 96-9p in finding that an assistive device was not medically necessary and substantial evidence supports that finding. The ALJ's explanation that the objective medical findings did not support a need for a cane demonstrated that the ALJ properly considered whether a cane was medically necessary. Additionally, as discussed above, substantial evidence supports the ALJ's decision not to include the use of an assistive device in the RFC. Thus, this issue does not require remand.

**B. The ALJ did not err by failing to recontact the Consultative Examining Psychologist.**

Since the ALJ found the opinion of the consultative examining psychologist only partially persuasive because, "Dr. Dubey did not provide a specific function-by-function assessment of what the claimant could do despite her impairments" (Tr. 33), Dahms argues it was incumbent on the ALJ to request additional information from him. (ECF Doc. 8, pp. 11-12). Dahms suggests that social security rules and regulations require the ALJ to resolve any

[2] In Plaintiff's Brief on the Merits, she cites to Tr. 730 for March 2023 findings that were "positive for 'walker dependence'". The Court finds no such reference there, and notes that the page in question details examination notes from May 3, 2022. Similar errors in citation are noted throughout the Brief. The Court acknowledges that Dahms claims walker dependence on March 28, 2023 at Tr. 704, although that claim is not adopted by a medical source.

insufficiencies or inconsistencies in the record, and the failure to seek more information was therefore reversible error. (ECF Doc. 10, p. 4).

The Commissioner responds that the determination of whether to request additional evidence was within the discretion of the ALJ. (ECF Doc. 9, p. 16). The Commissioner notes that the formulation of the RFC is an issue reserved to the Commissioner, rather than a medical source, and that the Commissioner need not defer or give any specific evidentiary weight to any medical opinion. (*Id.*). Finally, the Commissioner argues that the ALJ considered and found persuasive the prior administrative medical findings of the state agency psychological consultants, and the RFC determination is therefore supported substantial evidence. (*Id.* at pp. 17-18).

At Step Four of the sequential analysis, the ALJ must determine a claimant's RFC after considering all the medical and other evidence in the record. 20 C.F.R. § 404.1520(e). In doing so, the ALJ is required to "articulate how [he] considered the medical opinions and prior administrative medical findings." 20 C.F.R. § 404.1520c(a). At a minimum, the ALJ must explain how she considered the supportability and consistency of a source's medical opinion(s), but generally is not required to discuss other factors. 20 C.F.R. § 404.1520c(b)(2).

"An ALJ has discretion to determine whether further evidence, such as additional testing or expert testimony, is necessary." *Foster v. Halter,* 279 F.3d 348, 355 (6th Cir.2001). The regulations state: "If your medical sources cannot or will not give us sufficient medical evidence about your impairment for us to determine whether you are disabled or blind, we *may* ask you to have one or more physical or mental examinations or tests." 20 C.F .R. §§ 404.1517, 416.917 (emphasis added).

In evaluating Dr. Dubey's opinion, the ALJ wrote:

> The undersigned finds Dr. Dubey's opinion partially persuasive. Dr. Dubey opined that the claimant could understand, remember, and carry out simple and multistep instructions independently. She would be able to maintain concentration, attention and pace to remember and carry out simple – but not multistep tasks – due to cognitive, attention and memory issues evidenced. She would be able to do it with supervision, time and simpler tasks. She would have no difficulty dealing with work supervision or coworkers, but "many difficulties" in dealing with work pressure due to cognitive, attention and memory issues reported and evidenced. Stress would exacerbate mood issues and lead to "moderate problems" for her coworkers and supervisors (Exhibit 13F). Dr. Dubey's assessment is persuasive to the extent that it supports limitations with respect to reduced complexity, novelty, concentration, persistence, and social demands. This is generally consistent with the evidence, which shows cognitive deficits from ADHD, depression, and neurocognitive disorder, as well as depression and anxiety with reduced stress tolerance, but largely intact mental status exams. Dr. Dubey's opinion is also supported by the contemporaneous mental status exam, which was mostly intact, and results of IQ testing, which shows cognitive deficits, attention deficits, and memory deficits. However, Dr. Dubey did not provide a specific function-by-function assessment of what the claimant could do despite her impairments. Thus, the residual functional capacity translates Dr. Dubey's broad limitations in each domain into specific functional limitations and restrictions. Dr. Dubey's exam and opinion does not support greater limitations than assessed. This is consistent with the state-agency psychological consultants' conclusions as well (Exhibits 2A, 4A).

(Tr. 33).

Here, Dahms complains that the ALJ found Dr. Dubey's opinion "insufficient" as it did not contain a function-by-function assessment of what she could do despite her impairments. (ECF Doc. 8, p. 12). That claim misstates what the ALJ wrote. While the ALJ did find the opinion less persuasive due to its failure to provide such a specific assessment, nowhere in the opinion is it suggested that the opinion was "insufficient" given this lack. Rather, the ALJ indicates that, without that functional assessment, he had to "translate Dr. Dubey's broad limitations in each domain into specific functional limitations and restrictions." (Tr. 33). Such "translation" is not tantamount to an insufficiency.

The ALJ here properly analyzed the opinion as required by evaluating it for consistency and supportability. He noted that the opinion was "generally consistent with the evidence, which

shows cognitive deficits from ADHD, depression and neurocognitive disorder, as well as depression and anxiety with reduced stress tolerance, but largely intact mental status exams." (*Id.*). The ALJ further noted that the consultative examiner's opinion was consistent with those of the state-agency psychological consultants. (*Id.*). As to supportability, the ALJ wrote that the consultative examiner's opinion was "supported by the contemporaneous mental status exam, which was mostly intact, and results of IQ testing, which shows cognitive deficits, attention deficits, and memory deficits." (*Id.*). Thus, the ALJ provided substantial support for his determination of the persuasiveness of the opinion.

Had the ALJ felt that the record was insufficient to properly analyze Dahms' claims, it would have been within his discretion to request additional information. But here there was ample evidence on Dahms' impairments to evaluate her disability, so electing not to request further submissions did not rise to an abuse of the ALJ's discretion. Accordingly, I cannot recommend remand on this basis.

## VII. Recommendation

Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Dahms' application for SSI be affirmed.

Dated: September 30, 2026

Reuben J. Sheperd
United States Magistrate Judge

## OBJECTIONS

**Objections, Review, and Appeal**

Within 14 days after being served with a copy of this report and recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the magistrate judge. Rule 72(b)(2), Federal Rules of Civil Procedure; *see also* 28 U.S.C 636(b)(1); Local Rule 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.

***

Failure to file objection within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendations. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991) Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act." *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, 2 (W.D. Ky. June 15, 2018) quoting *Howard*. The failure to assert specific objections may in rare cases be excused in the interests of justice. *See United States v. Wandashega,* 924 F.3d 868, 878-79 (6th Cir. 2019)

*Id.*